# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF OHIO

# WESTERN DIVISION AT DAYTON

MARISOL MALLORY,

     Plaintiff,    : Case No. 3:13-cv-220

 - vs -

          Magistrate Judge Michael R. Merz

CITY OF RIVERSIDE, et al

        :

     Defendants.

---

### DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND AMENDED MOTION TO STRIKE

---

   This case is before the Court on Defendants' Motion for Summary Judgment pursuant to

Fed. R. Civ. P. 56.  (Doc. No. 23).   Plaintiff filed a Memorandum in Opposition (Doc. No. 30)

and Defendants filed a Reply (Doc. No. 31).   In addition, Defendants moved that this Court

admonish Plaintiff's counsel for ethical violations arising out of alleged racial allegations.  See

Reply, Doc. No. 31.  In response Plaintiff filed an Amended  Motion to Strike the portion of

Defendant's Reply alleging the ethical violations (Doc. No. 35), Defendants filed a Reply to that

Motion on June 13, 2014 (Doc. No. 36).

The parties unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. §636(c) in their Rule 26(f) Report (Doc. No. 12) and Judge Rice has referred the case on that basis. (Doc. No. 13).

This Court has subject matter jurisdiction under Title 28 of the USC Section 1331 , 1343, and 1367. (Complaint, Doc. No. 1, PageID 3.)

## Applicable General Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id*. The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-250 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992), *quoting Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Alexander v. Caresource,* 576 F.3d 551 (6th Cir. 2009), *citing Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F.2d 606 (6th Cir. 1992).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.,* 260 F.3d 574, 581 (6th Cir. 2001). "Materiality is determined by the substantive law claim." *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir. 2000). An issue is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Niemi v. NHK Spring Co., Ltd.,* 543 F.3d 294, 298 (6th Cir. 2008); *Henson v. Nat'l Aeronautics & Space Admin.,* 14 F.3d 1143, 1148 (6th Cir. 1994), *quoting Liberty Lobby,* 477 U.S. at 248. Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health*

*Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact.  *Simmons-Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir. 2000), *rev'd on other grounds,* 536 U.S. 639 (2002).  Thus, a factual dispute which is merely colorable or is not significantly probative will not defeat a motion for summary judgment which is properly supported.  *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied* 510 U.S. 976 (1993); *see also, Int'l Union United Auto., Aerospace & Agriculture Implement Workers of America v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999), *cert. denied* 529 U.S. 1076 (2000).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street,* 886 F.2d at 1479.  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]."  *Liberty Lobby,* 477 U.S. at 252.  If, after sufficient opportunity for discovery, the non-moving party is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.,* 477 U.S. at 322-23.

**Facts of the case**

This case arises from an encounter between Plaintiff, Marisol Mallory, and Defendants, Sergeant Harold Jones and Officer Matthew Jackson, when Defendants cited Plaintiff for keeping hens and roosters on her property in violation of city ordinance, and seized the animals from Plaintiff.

5

The situation originated when an employee for the United States Postal Service, Sandy Valenzuela, notice several shipments of live animals, specifically roosters and hens, being shipped to the residential address of 2603 Rondowa Avenue, Riverside, Ohio. (Aff. of Valenzuela at Motion for Summary Judgment, Doc. No. 23-1, PageID 366, ¶¶ 5-7.) Concerned that the roosters may have been shipped for the purposes of cockfighting, she contacted the Humane Society of Greater Dayton. *Id*. at ¶¶ 8-10.

A Humane Agent for the Humane Society of Greater Dayton, Sheila Marquis, collected the information from Ms. Valenzuela about the initial shipments of chickens to Ms. Mallory's residence. (Aff. of Marquis at Motion for Summary Judgment, Doc. No. 23-2, PageID 368, ¶ 4.) She was then informed of additional shipments arriving a few days later. *Id*. at ¶5. In addition to the information from Valenzuela, the Humane Society received two other phone calls complaining of cockfighting at 2603 Rondowa Avenue. *Id*. at PageID 369, ¶7. Marquis went to the address to investigate, but there was no one home and the garage door was closed and the windows covered. *Id*. at ¶8. After this initial attempt to investigate, the Humane Society was again contacted by an unidentified caller reporting suspicions of cockfighting, having seen cages of birds in the garage and several cars pulling up and parking at that address. *Id*. at ¶¶9-10. Based on these calls, as well as her own personal knowledge that cockfighting is prohibited by stated and federal law, Marquis contacted a member of the Riverside police, Chief Michael Brown, to share her suspicions. *Id*. at ¶¶13-14; Aff. of Brown at Motion for Summary Judgment, Doc. No. 23-4, PageID 377, ¶5.

Chief Brown advised police sergeants about the suspected activity and asked them to inform the patrol officers. *Id*. at ¶7. On or before July 31, 2012, officers were made aware that keeping poultry in the city was in violation of city law and that local and state law both

6

prohibited animal cruelty and cockfighting. Further, they were informed of the suspected activity at 2603 Rondowa Avenue. *Id*.

On routine patrol on July 31, 2012, Officer Jackson drove by Plaintiff's residence, 2603 Rondowa Ave, and observed several chickens running loose in the unenclosed yard. He called for backup and shortly thereafter Sgt. Jones arrived. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 386, ¶¶6-9); (Aff. of Jones, at Motion for Summary Judgment, Doc. No. 23-5, PageID 379, ¶¶ 6-7); (Complaint, Doc. No. 1, PageID 4, ¶¶ 9-10.)

As most of the free roaming birds were in the backyard, the officers approached the rear sliding patio door and knocked. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 386, ¶10); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 379, ¶9);(Complaint, Doc. No. 1, PageID 4, ¶11.) When there was no answer, Sgt. Jones went around to the front of the house to knock at the front door, while Officer Jackson remained at the back patio door. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 386, ¶11); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 379, ¶¶ 10.) After receiving no answer at the front door, Sgt. Jones rejoined Officer Jackson near the patio. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 386, ¶12); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 379, ¶¶ 10.)   At this point they heard screeching noises coming from the garage and could not tell if it was animal or human. Officer Jackson believed that whatever was making the noise was unhealthy. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 386, ¶13); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 379, ¶ 12.)

The garage door was located to the left of the patio door. The officers stated that the door was slightly ajar and upon knocking the door swung open enough to give them a view in which

they could see cages of fowl, and at least one bird roaming free in the garage. (Aff. Of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 386-7, ¶¶13-15); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 379-80, ¶¶ 12-16.) Upon his initial view of the animals, Sgt. Jones noted that several of the chickens appeared to be suffering from various injuries and were in altered states , i.e., their combs had been removed. (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 380, ¶15.) At this point Sgt. Jones entered the garage and made two video recordings. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 386-7, ¶¶13-15); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 380, ¶16.)

Plaintiff's son, Malik Mallory, then came out the house. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 387, ¶16); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 380, ¶17.) (Complaint, Doc. No. 1, PageID 5, ¶12.) The police asked his identity and requested that he call his mother. (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 380, ¶18.) Upon Plaintiff's arrival home, with her boyfriend Misael Vargas, Sgt. Jones advised her of her Miranda rights. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 387, ¶19); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 381, ¶21.) Ms. Mallory admitted that she kept chickens and offered to show the officers. She then voluntarily opened the main garage door. She stated that she liked chickens, she sent them to family in Puerto Rico, and that she did not know that keeping them was illegal in Riverside. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 387-8, ¶¶21-23); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 381, ¶¶22-24.)

At this point the officers asked permission to search the home for fighting paraphernalia

to which Ms. Mallory consented. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 388, ¶24); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 381, ¶25.) She signed a written consent form stating that the consent was given voluntarily without threats or promises. At this point the narrative between the parties differs. Defendants contend that she gave this consent freely and willingly, whereas Plaintiff argues she only gave her consent under duress as the officers had threatened her boyfriend, an undocumented alien, with deportation. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 388, ¶¶24-25); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 381, ¶28); (Aff. of Mallory at Response, Doc. No. 30-1, PageID 677, ¶¶7-8); (Complaint, Doc. No. 1, PageID 5, ¶¶16-18.)

A search of the house revealed no fighting paraphernalia. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 388, ¶26); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 381, ¶29); (Complaint, Doc. No. 1, PageID 6, ¶20.)

However, due to the violation of city ordinance prohibiting keeping fowl in a zoned residential area, as well as the physical state of the birds, officers from the Montgomery County Animal Resource Center requested that Ms. Mallory surrender the birds to the care of the Resource Center. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 388, ¶27); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 382, ¶30.) She signed owner release forms, but again argues she did so under duress as officers told her they were taking "Misael or the birds." (Aff. of Mallory at Response, Doc. No. 30-1, PageID 677-8, ¶¶9-11); *But see*, Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 388, ¶27; Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 382, ¶31. The Resource Center seized the birds and transported them to their facility. (Complaint,

Doc. No. 1, PageID 6, ¶21.) Riverside police cited Ms. Mallory for a zoning violation. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 388, ¶30); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 382, ¶33); (Complaint, Doc. No. 1, PageID 6, ¶21.)

On August 1, 2012, veterinarian Dr. Kelly Meyer examined the seized birds and determined that the state of the birds were consistent with birds that were trained and/or bred for fighting. (Aff. of Meyer at Motion for Summary Judgment, Doc. No. 21-13, PageID 462, ¶¶8-14); (Meyer Report at Motion for Summary Judgment, Doc. No. 23-30, PageID 488.) All but one rooster were dubbed (having combs and wattles trimmed or removed) and had their spurs cut down, which for fighting purposes would be used to add weapons to their legs. (Meyer Report at Motion for Summary Judgment, Doc. No. 23-30, PageID 488.) Other birds showed facial injuries and having feather plucked, and several of the injuries appeared to be several weeks to no more than one year old. *Id*. Two of the roosters had injuries so severe as to require euthanizing and the rest of the fowl were placed in various homes. *Id*.

The zoning violation case was dismissed when it was determined that the officers improperly notated the proper city ordinance violation code in its citation. (Aff. of Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 388, ¶30); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 382, ¶33.) Thereafter, Ms. Mallory and Riverside Chief of Police Reiss exchanged letters, in which she requested the return of her pets and he allegedly responded by threating to bring additional charges against her unless she let the matter drop. (Complaint, Doc. No. 1, PageID 11, ¶¶38-42.)

On July 4, 2013, Plaintiff filed suit in this Court on the basis of various federal and state claims. Defendants' filed a Motion for Partial Judgment on the Pleadings and this Court

determined that it was proper to dismiss several of the causes of action, with the exception of the Fourth Amendment claims. (Complaint, Doc. No. 1); (Answer, Doc. No. 9); (Defendants' Motion for Partial Judgment on the Pleadings, Doc. No. 15); (Decision, Doc. No. 18). The Court permitted Plaintiff opportunity to seek leave to amend her Complaint, but she failed to do so. As such the Fourth Amendment claim remains the only claim before this Court. (Decision, Doc. No. 18, PageID 98, 102-103, 108.)

## ANALYSIS

### First Claim For Relief

### 42 U.S.C. §1983 Conspiracy to Violate Plaintiff's 4th, 5th, and 14th Amendment Rights

### Second Claim For Relief

### 42 U.S.C. §1983 Violation of Plaintiff's 4th, 5th, and 14th Amendment Rights

In her First Claim for Relief, Plaintiff argues a deprivation of her constitutional rights arising out of the conspiratorial acts of Defendants Jones and Jackson, in both their individual and official capacities. (Complaint, Doc. No. 1, PageID 7, ¶ 26.) In addition she links the City of Riverside for both its policies and customs, as well as its failure to properly train and supervise its police officers. *Id.* She claims, that as a direct and proximate result of the conspiracy among these Defendants, she has suffered not only the deprivation of her Constitutional rights, specifically those under the Fourth, Fifth, and Fourteenth Amendments, but she has also suffered severe emotional distress, humiliation, loss of income, and paid attorney fees. *Id.* at ¶ 26. In her

11

Second Claim for Relief, Plaintiff alleges the same violations as in her First Claim, without the conspiracy allegation . (Complaint, Doc. No. 1, PageID 8, ¶ 29.)

This Court previously held in its Decision and Order on Defendants' Motion for Partial Judgment on the Pleadings that Plaintiff did not sufficiently plead a violation of her Fifth Amendment right against self-incrimination, and as such, this portion of the claim was dismissed. (Decision, Doc. No. 18, PageID 101.)

The Court additionally held that the portion of the claim pertaining to municipal liability in policy and training procedures was not sufficient to state a plausible claim. Plaintiff failed to allege with specificity any policy, custom, or practice of the City of Riverside which in effect deprived her of her constitutional rights. Nor had she established an adequate claim is it relates to the training and supervision of Riverside officers.   Based on its analysis, the Court determined that the Defendants were entitled to judgment on these portions of the claim. (Decision, Doc. No. 18, PageID 103-105.)

Further, this Court previously determined, in relation to the First Claim for Relief, that Plaintiff's Complaint failed to adequately plead a claim of conspiracy to violate her federal and state constitutional rights under § 1983. (Decision, Doc. No. 18, PageID 101.)  Plaintiff's allegations lacked specificity and were conclusory in nature, arguing only that Sergeant Jones and Officer Jackson acted together in violating her rights. *Id*. at PageID 102.  This Court held that two persons acting together under color of law is not enough to establish a conspiracy. Additionally, a corporation or other entity cannot conspire with its own agents or employees. *Id*. The Court granted Defendants' request to dismiss this portion of the claim, however allowed Plaintiff  the opportunity to amend her Complaint to fix the deficiency, specifically to show how

"defendants acted together with some unlawful purpose other than carrying out their duties." *Id.* at PageID 103. To date, Plaintiff has failed amend and the Court adheres to its previous analysis and both the portion of this claim, as well as the Third Claim for Relief as it pertains to a conspiracy, are found to be insufficient to support a plausible claim.

The Court turns to the remaining portion of the Second Claim for Relief, that pertaining to Ms. Mallory's Fourth Amendment rights and the alleged violation. (Decision, Doc. No. 18, PageID 100.) To establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must prove 1) the defendant was acting under the color of state law, and 2) the offending conduct deprived the plaintiff of rights secured by federal law. *Parratt v. Taylor*, 451 U.S. 527 (1981); *see also Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008), *quoting Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). "To succeed on a § 1983 claim against a local government, the plaintiff must also prove that the injury about which she complains was caused by an unconstitutional government policy or custom." *Lambert*, 517 F.3d at 439, *citing Monell v. Dep't Of Soc. Servs.*, 436 U.S. 658, 694 (1978)("[I]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.")

When making a § 1983 claim, mere conclusory allegations that action is arbitrary, capricious, a denial of due process and equal protection is not sufficient. Under Fed. R. Civ. P. 8(a), facts must be pleaded. *Car-Two, Inc. v. Dayton*, 357 F.2d 921 (6th Cir. 1966).

> "This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)(*citing Terrance v. Northville Reg'l Psychiatric Hosp.*,

> 286 F.3d 834, 842 (6th Cir. 2002)). We must analyze separately whether Heyne has stated a plausible constitutional violation by each individual defendant, and we cannot ascribe the acts of all Individual Defendants to each individual defendant. See id. at 684-88; *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 512-15 (6th Cir. 1991); see also *Colvin*, 605 F.3d at 292 ("Allegations of respondeat superior do not sustain a § 1983 claim against state employees in their individual capacities, meaning that officials are personally liable for damages under that statute 'only for their own unconstitutional behavior.'" (*quoting Leach v. Shelby Cnty. Sheriff,* 891 F.2d 1241, 1246 (6th Cir. 1989))).

*Heyne v. Metro. Nashville Pub. Schs*, 655 F.3d 556, 564 (6th Cir. 2011).

Government officials performing discretionary functions are afforded a qualified immunity under 42 U.S.C. § 1983 as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994); *Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994). The question is not the subjective good or bad faith of the public official, but the "objective legal reasonableness" of his or her action in light of clearly established law at the time the official acted. *Anderson v. Creighton*, 483 U.S. 635 (1987).

Qualified immunity analysis involves three inquiries: (i) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;" (ii) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (iii) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005), *quoting Feathers v. Aey*, 319 F.3d 843,

848 (6th Cir. 2003). Qualified immunity must be granted if the plaintiff cannot establish each of these elements. *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 636 (6th Cir. 2004).

In order for the violated right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right; in light of pre-existing law, the unlawfulness of the official's action must be apparent. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir. 1992). The right must be defined at the appropriate level of specificity to determine whether it was clearly established at the time the defendants acted. *Wilson v. Layne*, 526 U.S. 603, 615 (1999), *citing Anderson v. Creighton.* The test is whether the law was clear in relation to the specific facts confronting the public official when he acted; the constitutional right must not be characterized too broadly without considering the specific facts of the case. *Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990). Although the very action in question need not have previously been held unlawful, its unlawfulness must be apparent in light of pre-existing law. *Id.* An action's unlawfulness can be apparent from direct holdings, specific examples described as prohibited, or from the general reasoning that a court employs. *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), *citing Hope v. Pelzer,* 536 U.S. 730 (2002). If officers of reasonable competence could disagree on an issue, immunity should be recognized. *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *Mumford v. Zieba*, 4 F.3d 429, 432 (6th Cir. 1993); *Gossman v. Allen*, 950 F.2d 338, 341 (6th Cir. 1991). A probable cause determination, even if wrong, is not actionable as long as it was a reasonable determination. Reasonableness is a question of law for the trial judge. *Hunter v. Bryant*, 502 U.S. 224 (1991).

"A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999), *quoting Conn v. Gabbert,* 526 U.S. 286 (1999). "Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609, *citing County of Sacramento v. Lewis,* 523 U.S. 833 (1998). *See also Saucier v. Katz,* 533 U.S. 194 (2001); *Siegert v. Gilley,* 500 U.S. 226 (1991); *Brennan v. Township of Northville,* 78 F.3d 1152, 1154 (6th Cir. 1996); *Jarvis v. Wellman*, 52 F.3d 125 (6th Cir.1995); *Megenity v. Stenger*, 27 F.3d 1120, 1124 (6th Cir. 1994); *Centanni v. Eight Unknown Officers*, 15 F.3d 587 (6th Cir. 1994); *Silver v. Franklin Twp.,* 966 F.2d 1031 (6th Cir. 1992).

> In determining whether a government employee is shielded from civil liability due to qualified immunity, this court typically employs a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit,* 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). In addition to the two steps listed above, this court occasionally considers a third step in the qualified immunity analysis. See id. at 310 n.2 ("Panels of this court occasionally employ a three-step qualified immunity analysis, as opposed to the two-step analysis set forth here. . . . [B]oth the two-step approach and the three-step approach can be said to capture the holding of [*Saucier* ].") (citations omitted). When utilized, this third step requires inquiry into "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v.*

> *Outlook Nashville, Inc.,* 380 F.3d 893, 901 (6th Cir. 2004) (citation and quotation marks omitted).
>
> The Supreme Court since *Saucier* has continued to analyze qualified immunity using the two-step approach, but this court has noted that "the three-step approach may in some cases increase the clarity of the proper analysis." *See Estate of Carter*, 408 F.3d at 310 n.2. If, on the other hand, the case at issue "is one of the many cases where, if the right is clearly established, the conduct at issue would also be objectively unreasonable," then this court has "collapse[d] the second and third prongs" in an effort to "avoid duplicative analysis." *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2005).

*Hills v. Commonwealth of Kentucky*, 457 F.3d 583, 587(6th Cir. 2006).

When a qualified immunity defense is presented on motion for summary judgment, the court must determine the circumstances with which defendants were confronted and the information they possessed. To make this determination, the Court must consider all the undisputed evidence produced in discovery, read in the light most favorable to the plaintiff. *Poe v. Haydon*, 853 F.2d 418, 425 (6th Cir. 1988), following *Green v. Carlson*, 826 F.2d 647, 650-52 (7th Cir. 1987). Application of the doctrine of qualified immunity to a particular defendant is a question of law. *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988). To overcome a defendant's motion for summary judgment based on qualified immunity, the plaintiff: (1) identify a clearly established right alleged to have been violated; and (2) establish that a reasonable officer in the defendant's position would have known that the conduct at issue was undertaken in violation of that right. *Mays v. City of Dayton*, 134 F.3d 809 (6th Cir. 1998), *citing Pray v. Sandusky,* 49 F.3d 1154, 1158 (6th Cir. 1995). If the court finds no valid claim pursuant to 42 U.S.C. § 1983, the court need not reach the issue of qualified immunity. *Carlson v. Conklin,* 813 F.2d 769 (6th Cir. 1987).

In turning to the prima facie elements, the Court again notes that it previously determined that Ms. Mallory failed to establish a plausible claim of conspiracy with, or individual actions  by, Defendants City of Riverside, Chief of Police Mark Reiss, and Jane and John Does. (Decision, Doc. No. 18.) Specifically she failed to establish a plausible claim on the basis of local government policy, custom, or a failure to proper train or supervise their employees. *Id*., *see also Lambert*, 517 F.3d  at 439.  As such these Defendants will not be considered in the Court's forthcoming analysis.

There is no doubt that  Defendants Jones and Jackson were acting under the color of state law. (Complaint, Doc. No. 1, PageID 4, ¶¶ 9, 10)( "the Riverside Police, namely Riverside Police Officer Matthew Jackson while on routine patrol . . . " "Officer Jackson called for 'back up' and Sgt. Harold Jones arrived on the scene."); (Answer, Doc. No. 9, PageID 36, ¶ 9)(Admitting the allegations contained in paragraphs 9 and 10 of the Plaintiff's Complaint); (Decision, Doc. No. 18, PageID 97)("Plaintiff has adequately alleged that each of these officers acted toward her under color of law, which is necessary and sufficient to invoke the remedy of § 1983.")

As to the second element, Ms. Mallory alleges that Defendants violated her Fourth Amendment right by conducting an unreasonable search of her garage and home. "[W]ithout warrant and without probable cause or legal authorization . . .  entered upon the land of the homeowner.  Both officers knocked on the rear door of the home.  When the police officers were convinced no person was home, Sgt. Jones surreptitiously and intentionally entered into Plaintiff's secured, attached, storage area of the actual residence, without the owner's permission and undertook to illegally search Plaintiff's private premises without permission or warrant."

(Complaint, Doc. No. 1, PageID 4, ¶ 11.)  Further, any consent given to search her persons or home was obtained through coercion. *Id*. at PageID 5, ¶¶ 17-18.

> [P17] Officer Jones, using a human being for leverage against the Plaintiff, gave the Plaintiff the choice of either allowing a police search of her house and surrender of the chickens and roosters or they [the police] would take Plaintiff's friend, Miseal, [sic] into custody immediately, call I.C.E., and have Miseal deported.
>
> [P18] Sgt Jones advised Plaintiff that, someone is getting locked up, it was Plaintiff's choice of either the illegal alien or the fowl. Sgt. Jones held up his I-phone and repeated several times, I'll call I.C.E., I'll call I.C.E., I have them on speed dial.

*Id*.

Her final allegation is that the violations of her rights under the Fourth Amendment culminated with the seizure of her pets. "The Riverside Police confiscated all of the child's pets [Plaintiff's chickens and roosters], and wrote the Plaintiff a citation misdemeanor and drove off. . . . The Riverside Police allowed, authorized and facilitated the killing of several of the roosters and chickens and had the rest given away to other persons." *Id*. at PageID 6, ¶¶ 21-22.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. Amend. IV. The Fourth Amendment protection applies in both civil and criminal cases. In order for this right to be triggered, the threshold question must be whether there was a search or a seizure under the terms of the Fourth Amendment.  The Supreme Court has held that "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). The core of this right is the belief that man has a right to retreat into his own home and therefore be free from unreasonable government intrusion. *Silverman v. United States*, 365 U.S. 505, 511 (1961).  The

courts have interpreted this right to extend to not only the home, but the curtilage of the home, as individuals "possess a 'reasonable expectation of privacy' in the area surrounding and appurtenant to the home." *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998). The Supreme Court has observed that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id.*, *quoting United States v. Dunn*, 480 U.S. 294, 300 (1987).

The Fourth Amendment imposes a requirement that police officers obtain a warrant prior to conducting a search. *United States v. Galaviz,* 645 F.3d 347 (6th Cir. 2011), *citing Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

> Searches conducted without warrants have been held unlawful "notwithstanding facts unquestionably showing probable cause," *Agnello v. United States*, 269 U.S. 20, 33, for the Constitution requires "that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police. . . ." *Wong Sun v. United States*, 371 U.S. 471, 481-482. "over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes," United *States v. Jeffers*, 342 U.S. 48, 51, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment [FN 18 See, e.g., *Jones v. United States*, 357 U.S. 493, 497-499; *Rios v. United States*, 364 U.S. 253, 261; *Chapman v. United States*, 365 U.S. 610, 613-615; *Stoner v. California*, 376 U.S. 483, 486-487]- - subject only to a few specifically established and well-delineated exceptions. [FN 19 See, e.g., *Carroll v. United States*, 267 U.S. 132, 153, 156; *McDonald v. United States*, 335 U.S. 451, 454-456; *Brinegar v. United States*, 338 U.S. 160, 174-177; *Cooper v. California*, 386 U.S. 58; *Warden v. Hayden*, 387 U.S. 294, 298-300].

*Katz v. United States*, 389 U.S. 347, 357 (1967).

Officers, may however, proceed with warrantless search and seizures without violating the Fourth Amendment providing certain exceptions or extenuating facts are present. *Kentucky v.*

*King*, 131 S. Ct. 1849, 1856 (2011), *citing Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). These exceptions include; hot pursuit, automobile search, exigent circumstances (such as to render emergency aid and to prevent destruction of evidence), search incident to lawful arrest, and that the item discovered in the search and seized was in plain view. *Texas v. Brown*, 460 U.S. 730, 736 (1983).

Based on statements made at deposition by the complaining party as well as the officers, it is without question that the officers entered both the home of Ms. Mallory, as well as the attached garage without a warrant. Because the issue now before us is on summary judgment, this Court is required to view all evidence and draw all reasonable inferences in favor of the non-moving party, Ms. Mallory.

Plaintiff does not contest that Defendants had the right to enter her yard to gain access to the door in an attempt to announce their presence. (Response, Doc. No. 30, PageID 672.) Rather, she is alleging the warrantless search resulted when Sgt. Jones stepped into her attached garage to observe and videotape the chickens. *Id.* She argues that this area is classified as curtilage as it "extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of home itself for Fourth Amendment purposes." *Id.*, *quoting Oliver v. United States*, 466 U.S. 170, 180 (1984).

The Court must first consider if the area searched falls under curtilage as a means of determining if there was in fact an expectation of privacy which was breached upon, and in turn a possible violation of the Fourth Amendment. In defining curtilage, the United States Supreme Court has stated:

> We therefore regard the area "immediately surrounding and associated with the home"—what our cases call the curtilage - - as

"part of the home itself for Fourth Amendment purposes." *Oliver, supra*, at 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214. That principle has ancient and durable roots. Just as the distinction between home and the open fields is "as old as the common law," *Hester, supra*, at 59, 44 S. Ct. 445, 68 L.Ed. 898, so too is the identity of the home and what Blackstone called the "curtilage or homestall," for the "house protects and privileges all its branches and appurtenants." 4 W. Blackstone, Commentaries on the Laws of England 223, 225 (1769). This area around the home is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809, 90 L.Ed. 2d 210 (1986).

While the boundaries of the curtilage are generally "clearly marked," the "conception defining the curtilage" is at any rate familiar enough that it is "easily understood from our daily experience." *Oliver*, 466 U.S., at 182, n.12, 104 S. Ct. 1735, 80 L. Ed. 2d 214. Here there is no doubt that the officers entered it: The front porch is the classic exemplar of an area adjacent to the home and "to which the activity of home life extends." *Ibid.*

*Florida v. Jardines*, 133 S. Ct. 1409, 1414-1415 (2013).

In resolving the issue of what defines the extent a home's curtilage, the Supreme Court has recommended a four factor approach. *United States v. Dunn*, 480 U.S. 294, 300-301 (1987). These factors, while not definitive, offer tools to aid in the determination as to whether the area in question is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection. *Id*. at 301. These factors include: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. *Id.*, *citing California* v. *Ciraolo*, 476 U.S. 207, 221 (1986) (POWELL, J., dissenting) (citing *Care* v. *United States*, 231 F.2d 22, 25 (10th Cir. ), cert. denied, 351 U.S. 932 (1956); *United States* v. *Van Dyke*, 643 F.2d 992, 993-994 (4th Cir. 1981)).

Applying the above factors to Plaintiff's garage, the Court finds it should be considered curtilage. Plaintiff's garage is attached to her home, with a door joining the two. Therefore, it is linked to the home physically and psychologically. While it does not appear that there was an enclosure surrounding the home, the structure of garage itself protected the interior area of the garage from observation by people passing by. It was an enclosed structure, whereby people and a car could only come and go through doors. There is no evidence before us that the main garage door (by which the car may enter and leave) or other doors were consistently left open so as to allow any passerby to observe the interior of the garage. The uses to which garages are put are clearly personal, in terms of parking a car and personal storage, and one in which is afforded some privacy. Further, courts have typically recognized that outbuildings, such as garages, are part of the home's curtilage. The general rule is that the "[curtilage] includes all outbuildings used in connection with a residence, such as garages, sheds, [and] barns . . . connected with and in close vicinity of the residence." *Dunn*, 480 U.S. at 308, *quoting Luman v. Oklahoma*, 629 P.2d 1275, 1276 (Okla. Crim. App. 1981). Therefore, the search was conducted in a constitutionally protected area as there was an expectation of privacy, and one that is easily understood from daily experiences. Thus, the garage is part of the curtilage to Plaintiff's home and under the umbrella of the Fourth Amendment protections.

In their Motion for Summary Judgment, Defendants offer various exceptions excusing the warrant requirement and protecting the integrity of this search, specifically that of exigent circumstances and plain view. (Motion to Dismiss, Doc. No. 23, PageID 354-356.) Further, Defendants assert that this exception has been extended to cover exigent circumstances involving the health and well-being of animals. *Id*. at PageID 355.

"[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978). One example of an exigent circumstance is the need to render medical aid- to assist persons who are seriously injured or threatened with such injury. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id*., at 392, *quoting Wayne v. United States*, 115 U.S. App. D.C. 234 (C.A. D.C. 1963); *Brigham City v. Stuart*, 547 U.S. 398 (2006). Police cannot, however, "manufacture" exigent circumstances through unlawful or unreasonable action, as a way of invoking circumstances that justify a warrantless entry into the premises. *United States v. Elkins*, 300 F.3d 638, 655 (6th Cir. 2002). Further, the warrantless search must be "strictly circumscribed by the exigencies which justify its initiation . . ." *Mincey*, 437 U.S. at 393, *quoting Terry v. Ohio*, 392 U.S. 1, 25-26 (1968). Put in other terms, the scope of the warrantless search and its duration is dictated by the emergency at hand, e.g., a four-day search of a home which included going through drawers and ripping up the carpet cannot be justified by the concerns that arose from the original emergency situation and emergency search. *Id*.

The plain view exception holds that the observations of "objects falling into plain view of an officer who has a right to be in the position to have that view . . . may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968). This exception provides grounds for a search and seizure of an item provided that the officer's access to the plain view of the item had some prior justification under the Fourth Amendment. *Texas v. Brown*, 460 U.S. 730, 738 (1983). In other words, plain view is better understood as an extension of whatever the prior

justification the officer may have to access the item, rather than a "stand alone" independent exception to the warrant requirement.

Defendants allege that they entered Ms. Mallory's property as a result of a legitimate law-enforcement purpose, to alert her that chickens were running loose in her yard creating a nuisance and in violation with the City of Riverside's zoning codes. (Motion to Dismiss, Doc. No. 23, PageID 354.) This purpose of this "intrusion" was to contain the chickens within the property rather than allow them to wander onto the street where they would pose a danger to themselves and motorists. *Id*. at PageID 355. Plaintiff does not contest the legality of the Defendants entering her property for the purposes of "knock and talk." (Response, Doc. No. 30, PageID 672.) Once the officers were on the property they heard a screeching noise coming from the garage. (Motion to Dismiss, Doc. No. 23, PageID 356.) Officers were unable to tell what or who was making the noise, but described the screeches as being childish or female in nature and as sounding "unhealthy." *Id*., (Depo. of Jones, Doc. No. 24, PageID 514.) Thinking this to be an emergency situation, one of the officers walked over to the garage and noticed the door ajar. Upon knocking the door swung open and permitted him to see the roosters and chickens inside, placing them within plain view. (Motion to Dismiss, Doc. No. 23, PageID 356.) It was apparent to the officer that some of the birds were suffering from injuries consistent with cockfighting. *Id*. At some point the officer stepped inside the garage, shot a short video, and stepped back outside from the interior of the garage. (Depo. of Jones, Doc No. 24, PageID 512, 541-542.)

In considering the facts in a light most favorable to Ms. Mallory, the Court finds that the officers were lawfully on Ms. Mallory's property for the purposes of "knock and talk." The officers approached the garage door in what they considered to be an emergency situation as they were hearing "unhealthy" screeching noises and were unsure if it was animal or person. (Aff. of

Jackson at Motion for Summary Judgment, Doc. No. 23-7, PageID 386, ¶13); (Aff. of Jones at Motion for Summary Judgment, Doc. No. 23-5, PageID 379, ¶ 12);  (Depo. of Jones, Doc. No. 24, PageID 515, 522-3.) Once there, Sgt. Jones knocked on an already ajar door, which swung open providing a plain view of the interior of the garage and the crated animals. *Id*. at PageID 511-2, 515-6, 521-2.  It was obvious to Sgt. Jones, as well as the Court via the photos on record, that several of the birds were suffering from various degrees of injuries and in need of medical aid.

This Court has yet to consider the applicability of the exigent circumstances exception as it relates to animals, though it recognizes that several other courts havefaced that issue. Several courts have recognized that the need to protect life, to render medical aid, and to give assistance to those who are seriously injured or threatened with injury extends to the life and health of animals. See  *Shapiro v. City of Glen Cove*,  2007 U.S. App. LEXIS 12138 (2nd Cir. 2007)(circumstances known to the officers, that dogs were kept in a partially renovated uninhabited house that lacked electricity and heat, suggested that the dogs were in urgent need of assistance, thus permitting a warrantless search and seizure), citing *Siebert v. Severino*, 256 F.3d 648, 657 (7th Cir. 2001)(suggesting that "[e]xigent circumstances may justify warrantless seizure of animals"); *DiCesare v. Stuart*, 12 F.3d 973, 977-78 (10th Cir. 1993)(same); *Leathem v. United States*, 1997 U.S. App. LEXIS 23305 (9th Cir. 1997)(the exigent circumstances exception permitted immediate action to save the animals from severe illness and death as a result of lack of care and nutrition);  *Recchia v. City of Los Angeles Department of Animal Services*, 2013 U.S. Dist. LEXIS 150326, *13 (C.D. Cal. 2013)(Given the conditions of the animals (birds) and the unhygienic state of their housing, "exigent circumstances existed for the officers to search for and seize the suffering animals");  *People v. Rogers*, 708 N.Y.S.2d 795 (N.Y.App. Term

26

2000)(extending exigent circumstances to protect animals in danger, in this case the rescue of animals in a pet store in need of medical attention).

While the Court would be consider the extension of the exigent circumstances exception to animals, it is not clear that the fact pattern here fits with the immediate severity and need of the examples cited above. More specifically, it is unclear to this Court if the exigent circumstances continued after viewing the chickens through the door and obtaining the necessary information to make the determination that there was not a life, human or animal, currently at stake or an ongoing emergency situation. Even with the apparent injuries, the majority of the chickens and roosters in the garage were crated and not in substantial harm from which they needed immediate and warrantless removal. *See Bilida v. McCleod*, 211 F.3d 166, 173 (5th Cir. 2000)( No exigent circumstances existed to justify the warrantless entry and seizure of an already caged raccoon); *Moser v. Pa. SPCA*, 2012 U.S. Dist. LEXIS 149060, *28 (E.D. Penn. 2012)(stating that despite the same non-ideal living conditions of the horses, exigent circumstances justified the immediate seizure of the white mare due to its malnutrition, however those circumstances did not extend to and necessitate the immediate and warrantless seizure of the brown mare.)   Equipped with the knowledge that there was possible cockfighting at this location, but due to the current "safe" environment, it would have been prudent for the officers to secure the outside of the garage and obtain a warrant.  That said, however, given the changing nature of the law regarding exigent circumstances as applicable to animals, the contours of the law were not clearly established.  As demonstrated by the various jurisdictions above and the various timeframes of those decisions, it is very possible that officers of reasonable competence could and would disagree as to the law at that time. Because the law on exigent circumstances to protect the lives or health of animals  was not clearly established, and because a reasonable

person would not have known at the time whether this conduct violated clearly established statutory or constitutional rights, Sgt. Jones and Officer Jackson are entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

Further, a separate layer of exception applies to facts in suit Because  the door was ajar, and swung open upon knocking, the expectation of privacy is lessened.  In effect the open door created a path of visibility to any curious passerby, and one in which Sgt. Jones could have observed in either his citizen or official capacity.  *See United States v. Elkins*, 300 F.3d 638, 654 (6th Cir. 2002), *quoting James v. United States*, 418 F.2d 1150, 1151 (D.C. Cir. 1969), *also citing Texas v. Brown*, 460 U.S. 730, 740 (1983). The fact "that the policeman may have to crane his neck, or bend over, or squat, does not render the [plain view] doctrine applicable, so long as what he saw would have been visible to any curious passerby."  *Elkins*, 300 F.3d at 654, *quoting James*, 418 F.2d at 1151,  *also citing Texas v. Brown*, 460 U.S. at 740 (holding that the general public can look into the interior of an automobile from various angles, thus there should be no reason to preclude a police officer from observing the same, which would have been visible to him as a private citizen); *United States v. Pace*, 955 F.2d 270, 273 (5th Cir. 1992)(officers peering through a small opening in the back of a locked barn did not constitute a "search" under the Fourth Amendment); *United States v. Wright*, 449 F.2d 1355 (D.C. Cir. 1971) (shining a flashlight through a gap between closed garage doors was not a search for purposes of the Fourth Amendment).  The slightly opened door is somewhat analogous to the small opening in the barn or the gap in the garage doors as previous mention and upheld as a legitimate search. Thus, it is apparent that this discovery of the chickens falls under the plain view exception and was not a search for purposes of the Fourth Amendment.

In turning to the seizure of the animals the Court notes first and foremost that Ms. Mallory gave written consent to turn the fowl over to the Montgomery County Animal Resource Center.  The portion of the claim pertaining to the consent will be dealt with subsequently. However, for purposes of analysis under plain error, the Court notes that while a search compromises the individual's interest in privacy, a seizure deprives the individual of dominion over his or her property.  *Maryland v. Macon*, 472 U.S. 463, 469 (1985); *Katz v. United States*, 389 U.S. 347 (1967); *Brown*, 460 U.S. at 738.   Warrantless searches are presumed to violate the Fourth Amendment, but under certain circumstances, an officer may seize evidence in plain view without a warrant. *United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013), *citing Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987).    "[The] seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Payton v. New York*, 445 U.S. 573, 587 (1980), reaffirmed in *Brown*, 460 U.S. at 741-2. The standard of probable cause is a common-sense and flexible standard, requiring that the facts available to the police officer at that time "warrant a man of reasonable caution in the belief" that certain items may be contraband, stolen, or evidence of a crime. The standard does not require that this belief play out to be true or more than likely true. *Id.*, *citing Carroll v. United States*, 267 U.S. 132, 162 (1925).  However, "if police lack probable cause to believe the object in plain view is contraband, i.e. if 'its incriminating character [is not] immediately apparent,' the plain view doctrine cannot justify its seizure. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993), *citing Arizona v. Hicks*, 480 U.S. 321(1987).

In determining the validity of a warrantless seizure, it must first be established whether the officer violated the Fourth Amendment in arriving at the place from which the evidence

could be clearly viewed. Once this inquiry is satisfied, two additional points must be considered: 1) was incriminating character of the item in plain view "immediately apparent," and 2) not only must the officer be lawfully located where item can be seen but he or she must have lawful right of access to the object itself. *Horton v. California*, 496 U.S. 128, 136-137 (1990); *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Where the initial intrusion that brings police within plain view of the object is supported by one of the recognized exceptions to the warrant requirement, the seizure is legitimate. *Horton v. California*, 496 U.S. 128, 135 (1990). It further follows that if an officer is not searching for evidence against the accused, but inadvertently comes across incriminating objects, the plain view doctrine can be applied. *Id.*, citing *Harris v. United States*, 390 U.S. 234 (1968).

As we previously discussed, the officers were lawfully on the property to alert Ms. Mallory to the fact her chickens were roaming loose in her yard. Exigent circumstances, that of unhealthy screeching coming from the garage, prompted the officers to approach the garage to investigate. When knocking on the already ajar door, the door opened providing plain view to the chickens housed in the garage. As such, the officers came across the animals from a lawful vantage point.

As for the immediately apparent nature of the animals, *United States v. Mathis* provides an instructive four prong guide to aid in determining the "immediately apparent" prong: 1) the nexus between the seized item and items particularized in the warrant, 2) whether the intrinsic nature of the item gives probable cause to believe it is associated with criminal activity, 3) whether the officers, at the time of discovery of the item, with the facts then available to them, can determine probable cause of the item's incriminating nature, and 4) whether the office recognizes the incriminating nature of the item as a result of his "instantaneous sensory

perception. *Mathis*, 738 F.3d at 732, *citing United States v. Garcia*, 496 F.3d 495, 510-11 (6th Cir. 2007).

Here the officers had been informed, as recently as that very morning, as to suspicions of harboring fowl and suspected cockfighting at the home of Ms. Mallory. (Aff. of Brown at Motion for Summary Judgment, Doc. No. 23-4, PageID 377, ¶7); (Depo. of Jones, Doc. No. 24, PageID 513-4, 520-21.) Further, they were made aware that keeping poultry in the city was a violation of city law and that both local and state law prohibited animal cruelty and cockfighting. Based on information provided by the police department---as well as the Officer Jackson and Sgt. Jones' own observation of chickens running around the property, chickens caged in the garage, as well as visible injuries on several of the birds, the incriminating character was immediately apparent and the officers had probable cause to believe that these animals may be being used for illegal purposes and that they were being harmed in the process.

The Court now turns to the search of Ms. Mallory's home. It is undisputed by all parties that Ms. Mallory had a privacy interest in the place to be searched, and as such had authority to consent to the warrantless search of her home. However, Ms. Mallory contends that she did not give her consent freely and voluntarily, but rather upon threat of deportation of her boyfriend Misael Vargas. (Complaint, Doc. No. 1, PageID 5, ¶¶ 17-18); (Depo. of Mallory, Doc. No. 22-1, PageID 156, 158, 164, 168, 187); (Response, Doc. No. 30, PageID 673.)

Defendants argue that the consent obtained from Ms. Mallory was given freely and voluntarily. (Reply, Doc. No. 31, PageID 688.) Additionally, Defendants argue that despite the fact they did not make threats against Vargas, even had their statements been interpreted as such, this would not have been coercive under constitutional standards given Vargas' illegal resident status and the fact that the officers had probable cause to arrest him. *Id*. at PageID 688-89.

"A search by police . . . does not violate the Fourth Amendment 'if voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises.'" *Harajli v. Huron Township*, 365 F.3d 501, 506 (6th Cir. 2004), *quoting Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Whether consent to a search is given voluntarily is a question of fact. *United States v. Parr*ett, 552 Fed. Appx. 462,*3-4; *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998.) "Consent is voluntary when it is unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *Id.*, *quoting United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011).

When considering the validity of the consent to search, the Court considers the totality of the circumstances. "It is the Government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony' that valid consent was obtained." *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). Factors to be considered in making the determination whether or not the consent is valid include; age, intelligence, education level of individual, whether the individual understands he/she has the right to refuse consent, and whether the individual understands his/her constitutional rights. *Id.* The court should also consider factors such as the length and nature of the detention, the use of coercive of punishing conduct, as well as the use of "more subtle forms of coercion that might flaw [an individual's] judgment." *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011), *quoting United States v. Watson*, 423 U.S. 411, 424 (1976). Consent can only be given freely and voluntarily if it is free of coercion. *Id.* If the individual makes a claim of coercion or improper behavior as a means of trying to invalidate their consent, he or she must show "more than a subjective belief of coercion, but also some objectively improper action on the part of the police." *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995).

Though not directly on point, the Court notes a line of circuit cases pertaining to confessions obtained through alleged coerciove threats and notes that a person offering a confession is surrendering more rights than one giving consent to search.  The Sixth Circuit has stated that "coercion may involve psychological threats as well as physical threats. Specifically, threats to arrest members of a suspect's family may cause a confession to be involuntary." *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003), *quoting United States v. Finch*, 998 F.2d 349, 355 (6th Cir. 1993), *citing Rogers v. Richmond*, 365 U.S. 534 (1961).  However, the Sixth Circuit has articulated this as pertaining to situations where there are broken or illusory promises of leniency and threats of prosecution, at least in terms of confessions. *Johnson*, 351 F.3d at 262; *United States v. Siler*, 526 Fed. Appx. 573, 575 (6th Cir. 2013); *United States v. McWhorter*, 515 Fed. Appx. 511, 518 (6th Cir. 2013).     In *United States v. Dillard*, the Circuit held that the police were not intentionally coercive when they arrested a third party, defendant's mother, as she had  red dye on her hands, giving police officers probable cause to believe she was involved in the crime. The presumption that the mother would be released if defendant confessed did not amount to coercion as the mother's arrest was not fabricated, but rather police had a legitimate reason to bring her into custody. 1992 U.S. App. LEXIS 32863 (6th Cir. 1992); *see also Finch*, 998 F.2d at 355 (stating that because the police did not have probable cause to arrest the women found in the defendant's house, and there was no legal basis for threatening to do so, the tactic was coercive to obtain defendant's confession, thus rendering it involuntary); *Johnson*, 351 F.3d at 262-63 (whether or not the threat to arrest to obtain a confession was coercive turned on whether or not the threat could have been lawfully executed); *United States v. Hunter*, 332 Fed. Appx. 285, 289 (6th Cir. 2009) (same); *United States v. Bell*, 2013 U.S. Dist. LEXIS 60571, *29-30 (E.D. Tenn. 2013) (same).

In viewing the facts in a light favorable to Ms. Mallory, as this Court is required to do in summary judgment, the Court accepts her version of events, without weighing credibility of witnesses, that prior to giving consent to search her home and giving permission to take her chickens, there was a conversation between herself, Vargas, and Sgt. Jones regarding Vargas' immigration status. (Depo. of Mallory, Doc. No. 22-1, PageID 155, 157.) In addition to the questions as to citizenship status, it is alleged Sgt. Jones threatened to call I.C.E. unless Ms. Mallory consented to the search and seizure. *Id*. at 155.

Defendant Harold Jones admits that there was a short conversation between himself, Ms. Mallory, and Vargas. He states that he asked about the status of Vargas' citizenship. However, he denies making any threats to call I.C.E. or of making any sort of comments or threats regarding deportation. (Depo. of Jones, Doc. No. 24, PageID 525-533.) He does state however that upon learning of Vargas' illegal status he made a comment in the nature of "he [Vargas] could be in a bad spot." *Id*. at PageID 525-6.

After this conversation Ms. Mallory consented to the search, but testifies she did so because she was scared "because of the threat, you know, I just want to make sure that we say we have nothing to hide, we agreed to let them search the house to - - to prove that we have nothing to hide." (Depo. of Mallory, Doc. No. 22-1, PageID 160.)

In considering the totality of the circumstances, Ms. Mallory appears to have been an intelligent and educated woman. She was not subjected to a long detention nor physically punishing behavior. She was informed of her rights and appeared to have understood them. Assuming Ms. Mallory had been informed she was free to refuse consent to search, if as she has alleged, she was also told that it was "Misael or the birds" she may not have felt free or

34

unconstrained to exercise such decision. (Depo. of Mallory, Doc. No. 22-1, PageID 155-164); (Depo. of Jones, Doc. No. 24, PageID 546)(States that Ms. Mallory was informed she did not have to consent to the search and that she could withdraw her consent at any given point);(Depo. of Jones, Doc. No. 24, PageID 545-546) (Denies saying that it was Misael Vargas or the birds and that someone was going to go to jail). These statements may have served to exert pressure on her to acquiesce to the search. However, the Court notes that police interrogation in relation to one's identity and a request for identification does not, in and of itself, constitute a Fourth Amendment seizure. *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216 (1984). Sgt. Jones inquired as to everyone's identification and status, at which point Ms. Mallory and Vargas volunteered that Vargas had no identification and was illegal. (Depo. of Malik Mallory, Doc. No. 22-3, PageID 310) ([officers asked if his mother and her boyfriend were legal as well] "I answered honestly and said my mother was legal and I wasn't sure - - unsure about Misael 'cause I wasn't."); (Depo. of Jones, Doc. No. 24, PageID 525-526, 529-534); (Depo. of Mallory, Doc. No. 22-1, PageID 155)("Misael was next to me and he said well, are you legal, are you illegal? He threatened to call ICE . . . ); (Depo. of Mallory, Doc. No. 22-1, PageID 157) ("He asked if Misael was legal. He said I know - - he said I know you're not legal. He didn't ask. He said I know you are not legal.")("Did Misael admit to being undocumented?" " Yeah. . . . he said it when he was - - pointed at him and say, you know, I know you're illegal. . . he [Misael Vargas] said yes. . . Misael admitted he was illegal.") Thus, pursuant to the case law of the circuit, and in looking at the evidence in a light favorable to the non-moving party, assuming Sgt. Jones threatened Vargas with arrest and/or deportation, due to his admission that he was illegal, this was sufficient to create a probable cause for arrest. The alleged statement would not

have been considered coercive under Fourth Amendment standards for purposes of invalidating the consent.

As for the consent to seize the birds, again Ms. Mallory claims that the surrender of the animals was made under duress. However, because the animals were found in plain view from a legal vantage point, and the officers had probable cause to believe that that they were being used in a criminal activity, the seizure was proper.

The Court now considers the qualified immunity defense as applied to the consent issue. Again Defendants argue that the officers are immune from liability unless there is unlawfulness so apparent that no reasonable official would disagree that the conduct violated the law. It is well established law that the Fourth Amendment protects against unreasonable search and seizures.  It is also established law that officers could circumvent obtaining a warrant to search a residence if they obtained consent from the homeowner. Likewise, it is firmly established that such consent cannot be obtained through coercion.  However, the "contours of are not yet sufficiently clear" as to whether or not threats with a lawful basis and probable cause are considered coercive in obtaining consent. As it is not clearly established, reasonable officers in this situation may come to differing conclusions. *Malley v. Briggs,* 475 U.S. 335, 341 (1986);  *Mumford v. Zieba*, 4 F.3d 429, 432 (6th Cir. 1993); *Gossman v. Allen*, 950 F.2d 338, 341 (6th Cir. 1991).  As such, Defendants are entitled to  qualified immunity on this claim.

Based on the above analysis, and in viewing the evidence in a light most favorable to the non-moving party, Ms. Mallory, this Court finds that despite potential claims as to the exigency of the circumstances once officers opened the garage door, and in obtaining consent to search Ms. Mallory's home, qualified immunity applies.  Further, as a conspiracy cannot be established,

nor did Ms. Mallory establish a plausible claim on the basis of local government policy, custom, or a failure to proper train or supervise their employees, no other Defendants can be implicated in the alleged violations of the Fourth Amendment. This Motion for Summary Judgment on this claim is hereby granted.

### Third Claim For Relief

### Conspiracy to Violate Plaintiff's Ohio Constitutional Rights Under Article I, §§ 1, 4, 10, 11, and 14

In her Third Claim for Relief, Ms. Mallory alleges that the conspiratorial acts of Defendants, as well as the City of Riverside's official policies, customs, and failure to properly train and supervise its police officers, resulted in a violation of her rights under Article I, §§ 1, 4, 10, 11, and 14 of the Ohio Constitution. (Complaint, Doc. No. 1, PageID 9, ¶ 32.) As a result of these violations, Plaintiff has suffered the deprivation of her guaranteed rights, as well as severe emotional distress, humiliation, and loss of income. *Id.* at ¶ 33.

As discussed in the First Claim for Relief, this Court previously held that Plaintiff failed to properly set forth allegations of a conspiracy. (Decision, Doc. No. 18, PageID 101), *see supra.* Additionally, due to Plaintiff's lack of response to Defendants' assertion that Ohio law does not recognize a private cause of action for state constitutional violations, the Court granted Defendants' judgment on the pleadings on this claim for relief. *Id.* at PageID 107. No further analysis is necessary.

### Fourth Claim for Relief

**Violations of Plaintiff's Ohio Constitutional Rights Under Article I §§ 1, 4, 10, 11, and 14**

Plaintiff alleges that her rights under the Ohio Constitution were violated as a result of the actions of the various Defendants, the official policies and customs of the City of Riverside, and the failure to properly train and supervise Riverside police officers. (Complaint, Doc. No. 1, PageID 9-10, ¶ 35.) As a result of this violation, Plaintiff asserts she has suffered severe emotional distress, humiliation, and loss of income. *Id*. at PageID 10, ¶ 36.

In its Decision and Order on Partial Judgment on the Pleadings, this Court granted Defendants' judgment on the pleadings on their assertion that Ohio law does not recognize a private cause of action. (Decision, Doc. No. 18, PageID 107.) This claim does not require any further analysis.

**Fifth Claim for Relief**

**A Violation of 42 U.S.C. §1983 and Violations of Plaintiff's Ohio Constitutional Rights Under Article I §§ 1, 4, 10, 11, and 14**

In her Fifth Claim for Relief, Plaintiff alleges that Chief of Police Reiss abused his power via a letter dated September 14, 2012, in which he threatened her with additional charges unless she would "leave the matter expire." (Complaint, Doc. No. 1, PageID 11, at ¶ 40.) This letter was allegedly written in response to Plaintiff's two written requests demanding the return of her roosters and chickens after the underlying case had been terminated in her favor. *Id*. at ¶ 38. She argues that Reiss' response was an attempt to "coerce, compel, and manipulate Plaintiff to act in

a certain way, by the use of this threat, trickery and form of extortion, pressure and threat of use of future criminal prosecution." *Id*. at ¶ 39.  In addition she states this was a violation of  §1983, as well as her rights under the Ohio Constitution.

This Court previously held that Plaintiff failed to make a sufficient claim under §1983 as "not every violation of state statute constitutes a violation of the United States Constitution." (Decision, Doc. No. 18, PageID 106.) Relief was previously granted by this Court in favor of Defendants. *Id*.

**Sixth Claim For Relief**

**Common Law Torts:**

**Defendant Jones is guilty of the tort of false imprisonment**

**Defendants Jones and Jackson are guilty of trespass**

**Defendants Jones and Jackson and John Does are guilty of the tort of slander**

**Defendants Jones, Jackson, Reiss, and Flaute are guilty of tort of malicious prosecution**

**Defendant Reiss, in concert with mayor of Riverside, are guilty of libel**

**Defendant Jones and Jackson are guilty of intentional infliction of mental distress**

Plaintiff asserts that as a result of the actions of the named Defendants, she has been subjected to the common law torts of false arrest, false imprisonment, malicious prosecution, slander, and libel. (Complaint, Doc. No. 1, PageID 12, ¶¶ 45, 46, 48, 49, 50.)  In addition, Defendants are guilty of the common law torts of trespass and intentional infliction of mental distress. *Id*. at ¶ ¶ 47, 51.  As a direct and proximate result of the above actions, Ms. Mallory

argues she has suffered various Constitutional violations against her right to privacy, due process, and equal protection. *Id.* at PageID 13, ¶ 52.

The Court previously dismissed this claim as being conclusory in nature, and granted judgment on the pleadings to the Defendants.  (Decision, Doc. No. 18, PageID 107.)

**Motion under Fed. R. Civ. P. 12(f) and Sanctions**

Plaintiff argues that defense counsel is deflecting the true issue of this case, the legality of the search and seizure, by hiding behind the "racial based red herring" that Ms. Mallory was fighting roosters. (Response to Motion for Summary Judgment, Doc. No. 30, PageID 666)( Ms. Mallory "has a funny name. Is Puerto Rican, and she likes chickens and hens. Clearly, she must be illegally fighting roosters!")   She further states that, "[i]t is the stereotypes and preconceived conclusions that led to this injustice and as unbelievably, it is again being advanced in Defendant's motion."   In support of this notion she alleges that she was asked several times during her deposition whether she had her green card, was a resident-alien, or was an alien. *Id.* at PageID 667.

Counsel for the Defendants respond by arguing that this claim of alleged racism is both fabricated and offensive. (Reply to Motion for Summary Judgment, Doc. No. 31, PageID 680.) At no point in the pleadings, at least on the part of the defense, has there been mention of people having "funny names." Further during her deposition Ms. Mallory was asked if she was a naturalized citizen, for which counsel apologized upon the realization that residents of Puerto Rico are American citizens. *Id.* As a result of these racial allegations, defense counsel asks for

discipline against Plaintiff's attorneys for ethics violations under the Ohio Rules of Professional Conduct, as adopted by this Court. *Id.* at PageID 683, citing Rule IV(B), Model Federal Rules of Disciplinary Enforcement, adopted by the Southern District of Ohio United States District Court and attached to S.D. Ohio Civil Rules. See http://www.ohsd.uscourts.gov/localrules.htm. Specifically, Defendants direct this Court's attention to both the Court's "Introductory Statement on Civility," as well as Ohio Prof. Cond. Rules 3.1 ("Meritorious Claims and Contentions"), 3.3(a)(1) ("Candor Toward the Tribunal"), 3.5(a)(6) ("Impartiality and Decorum of the Tribunal"), 4.1(a) ("Truthfulness in Statements to Others"), 4.4(a) ("Respect for Rights of Third Persons"), and 8.4 (a, c, d) ("Misconduct"). *Id.*

Plaintiff opposes this portion of the Reply to the Motion for Summary Judgment and pursuant to Rule 12(f) of the Federal Rules of Civil Procedure asks that the Court strike the Reply. In the alternative, Plaintiff asks that the Court strike the portions of the Reply that are non-responsive to the law and memorandum of Plaintiff's Motion in Opposition to Summary Judgment, admonish defense counsel to comply with the Rules of Conduct and cease their attack against Plaintiff and Plaintiff's counsel, and admonish Defense counsel about filing nonresponsive motions. (Amended Motion, Doc. No. 35, PageID 707.) Plaintiff notes that motions to strike are generally disfavored, however, that is somewhat "relaxed in the context of scandalous allegations." *Id.* at 708, *citing* 5C. C Wright and A. Miller, Federal Practice and Procedure (Civil) 2d § 1382, at 466/67 (2004). Counsel further argues, "[t]he striking of offensive material is particularly appropriate when the offensive material is not responsive to an argument but, rather constitutes an inappropriate attempt to abuse the Court's process to attack an individual personally. *Id.*, *citing Magill v. Appalachia Intermediate Unit 08*, 646 F. Supp.

339, 343 (W.D. Penn. 1986); *Pigford v. Veneman*, 215 F.R.D. 2, 4-5 (D.C. 2003); *Murray v. Sevier*, 156 F.R.D. 235, 258 (Kan. 1994).

In addressing the merits, Plaintiff's counsel concedes that during deposition Ms. Mallory was asked if she was a naturalized citizen and upon realizing their error defense counsel was apologetic. Plaintiff maintains however, that thereafter, "truthful statements [regarding Plaintiff's ethnicity], professionally communicated by Plaintiff's counsel are not misconduct." *Id*. at PageID 709. It is further argued that at no time did they brand Defendants or Defendants' counsel as racist despite Defendants' efforts to put Plaintiff's ethnicity into contention. *Id*. Plaintiff concludes by stating that such allegations have no place in a motion for summary judgment. *Id*. (stating that the allegations are "unnecessary, unprovoked, unprofessional, and have no place in a motion for summary judgment. Plaintiff's counsel, in 25 years, has never seen this type of aggressive, unnecessary attack. Especially in the proper decorum of a federal proceeding. It is alarming and quite unprofessional.") Finally, Plaintiff's counsel, though in disagreement with the allegations made against them, state that it is the role of defense counsel to report a violation to the Ohio State Bar, rather than asking the Court to intercede on their behalf. *Id*. at PageID 710, *citing* Ohio Prof. Cond. Rule 8.3 ("Reporting Professional Misconduct").

Defendants respond that the Rule 12(f) is inapplicable in this situation. (Response, Doc. No. 36, PageID 712.) In addition, they reargue that any admonishment by the Court should be directed at Plaintiff's counsel and provide a sampling of potential racial allegations lodged against them by Plaintiff. *Id*. at PageID 713-714. Finally, they argue that while the ethical arguments may not be right on point as to the law regarding the Constitutional claims, they were made in direct response to the attacks set forth against them in Plaintiff's Memorandum Opposing Summary Judgment and supporting memos thereafter. *Id*. at PageID 714-716.

42

Under Federal Rule of Civil Procedure 12(f) a court may strike pleadings or portions of pleadings that are an insufficient defense, or any redundant, immaterial, impertinent, or scandalous matter. See Fed. R. Civ. P. 12(f); *Dassault Systemes v. Childress*, 663 F.3d 832, 846 (6th Cir. 2011). A pleading is defined under Fed. R. Civ. P. 7(a) as a complaint, an answer to a complaint, an answer to a counterclaim and crossclaim, a third-party complaint, and answer to a third party complaint, and if so ordered by the court, a reply to the answer. This Court has previously held that this rule is limited to pleadings rather than memoranduain support of a motion. *Zep Inc., Midwest Motor Supply Co.*, 726 F. Supp. 2d 818 (S.D. Ohio 2010). Instead, "trial courts make use of their inherent power to control their dockets, whether determining whether to strike documents or portions of documents." *Id*., *citing Anthony v. BTR Auto, Sealing Sys*., 339 F.3d 506, 516 (6th Cir. 2003). The Amended Motion to Strike is DENIED.

As asserted in the Reply to the Motion for Summary Judgment, this Court has in fact adopted the Model Federal Rules of Disciplinary Enforcement and Ohio Rules of Professional Conduct to regulate the ethical behavior of the attorneys practicing before it. See http://www.ohsd.uscourts.gov/localrules.htm (The Model Rules adopted by this Court clearly articulate that the Court is to apply the Rules of Professional Conduct adopted by the highest court between for alleged ethical violations and bring the matters before the various bar associations. ("A lawyer who possesses unprivileged knowledge of a violation of the Ohio Rules of Professional Conduct that raises a question as to any lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform a disciplinary authority empowered to investigate or act upon such a violation"); *see also Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 836 (6th Cir. 1999)(remanding with the recommendation that the district court refer previous

non-attorney "investigator" to the Ohio Bar Association for allegations of engaging in the unauthorized practice of law.)

Upon a full review, it is obvious to this Court that during Ms. Mallory's deposition defense counsel inquired as to her citizenship and, upon being reminded that Puerto Ricans are American citizens, quickly apologized for their error. There was no additional questioning on this matter, nor was there any mention of green card, nor as to whether she was a resident alien or an alien. Further this Court is at a loss to find any mention demeaning Ms. Mallory, her child, or her boyfriend based on their heritage or names. Nor does Plaintiff provide citation for such alleged comments in Defendants' pleadings, rather providing only a citation to Shakespeare's Hamlet, in arguing that counsel for defense "'doth protest a little to much." (Amended Motion, Doc. No. 35, PageID 709.)

Aside from Plaintiff's conclusory accusations in her Response to Defendant's Motion for Summary Judgment, she fails to articulate any specific facts to demonstrate that opposing counsel conducted himself in a racially discriminatory manner. Her statements as to the alleged comments are simply not supported by the record.

Further, despite the protestations to the contrary, Plaintiff does imply racial motives on the part of Defendants, as well as misstating the facts to fit those allegations. For example, "what is disturbing is that defendant concludes that Misael was an illegal alien. Perhaps because Misael also has a funny name!" (Response, Doc. No. 30, PageID 674.)  Officers were made aware of Vargas' immigration status, so this conclusion was based on the facts surrounding the event, not based upon anyone particular person's name. (Depo. of Malik Mallory, Doc. No. 22-3, PageID 310) ([officers asked if his mother and her boyfriend were legal as well] "I answered honestly

and said my mother was legal and I wasn't sure - - unsure about Misael 'cause I wasn't.");
(Depo. of Jones, Doc. No. 24, PageID 525-526, 529-534); (Depo. of Mallory, Doc. No. 22-1,
PageID 155)("Misael was next to me and he said well, are you legal, are you illegal? He
threatened to call ICE . . . ); (Depo. of Mallory, Doc. No. 22-1, PageID 157) ("He asked if
Misael was legal. He said I know - - he said I know you're not legal. He didn't ask. He said I
know you are not legal.")("Did Misael admit to being undocumented?" " Yeah.  . . . he said it
when he was  - - pointed at him and say, you know, I know you're illegal.  . . he [Misael Vargas]
said yes. . . Misael admitted he was illegal.")

Further, Plaintiff has taken information out of context and presented it to this Court as
being an accurate representation. Specifically in reference to the valuation of her birds. She has
stated that Mark Kumpf of the Montgomery County Animal Resource Center valued adult
roosters at anywhere between a couple hundred dollars to a couple thousand dollars. "I've heard
of birds that, you know,  may be  in the $10,000 range." (Response, Doc. No. 30, PageID 674);
see also Response, Doc. No. 30, PageID 669.  However, it is clear to this Court from Mr.
Kumpf's testimony, that that type of valuation is given to a hen or rooster that is used in
gambling and cockfighting, the very thing Plaintiff has denied since the day of the seizure.
(Depo. of Kumpf, Doc. No. 25,  PageID 594- 598.) Thus she is either misstating and inflating the
value of her birds now, valuing them at up to $4,000 per bird, or is conceding their value as
fighting birds as determined by this agent. (See, Response, Doc. No. 30, PageID 674.)

Plaintiff's counsel is close to the line of what constitutes "zealous advocacy." Precisely
because allegations of racist behavior are so serious if true, trumped-up allegations of racism,
unsupported by evidence, are particularly invidious.  Counsel is cautioned that such conduct in
the future will be sanctioned.

45

**CONCLUSION**

For the reasons set forth above, it is hereby ORDERED that the Motion for Summary Judgment be GRANTED.  The Clerk shall enter judgment dismissing the Amended Complaint with prejudice.

X    s/Michael R. Merz
_____
Signer 1